**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| Liberty Mutual Fire Insurance Company, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No.: 2:14-cv-02145-PMD |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| Rickie Joe McKnight and Clarice | ) | |
| McKnight, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This matter is before the Court on Plaintiff Liberty Mutual Fire Insurance Company's ("LMFIC") Motion for Summary Judgment (ECF No. 17) ("Motion") and Defendants Rickie Joe McKnight ("Mr. McKnight") and Clarice McKnight's ("Mrs. McKnight") (collectively "the McKnights") Cross Motion for Summary Judgment (ECF No. 18) ("Cross Motion"). For the reasons set forth herein, the Court denies LMFIC's Motion and grants the McKnights' Cross Motion.

## BACKGROUND

This declaratory judgment action arises out of an automobile accident and a resulting dispute between the McKnights and LMFIC over whether an automobile insurance policy provides underinsured motorist ("UIM") coverage in connection with the accident. LMFIC issued an automobile insurance policy to the McKnights bearing policy number A02-258-413081-70 0 4 ("Policy"), which afforded coverage to the McKnights, as named insureds, effective June 13, 2009. The Policy was subsequently renewed, with an effective period of June 13, 2010, through June 13, 2011, and the Parties do not dispute that the Policy was in effect at all times relevant to this action. As issued, the Policy provided liability coverage with limits of

$100,000/$300,000/$50,000 and uninsured motorist ("UM") coverage with limits of $25,000/$50,000/$25,000. According to the terms of the Policy, it did not include UIM coverage.

On February 27, 2011, Mr. McKnight was involved in a collision with Jorge Gonzales Islas ("Islas"). At the time of the accident, Islas was insured under an insurance policy issued by South Carolina Farm Bureau Insurance Company ("Farm Bureau"). On or about March 30, 2011, Farm Bureau tendered $25,000—apparently the minimum limits of Islas's policy with Farm Bureau—to the McKnights in exchange for a covenant not to execute against Islas and Farm Bureau. The McKnights subsequently notified LMFIC of their intent to seek UIM coverage under their Policy; however, LMFIC asserted that the McKnights did not elect to purchase such coverage.

On February 11, 2014, the McKnights filed a negligence action—and an accompanying loss of consortium claim—against Islas in state court, 2014-CP-22-00107 ("Underlying Action"). The McKnights thereafter served LMFIC with a copy of the complaint as required by section 38-77-160 of the South Carolina Code of Laws. LMFIC filed a conditional answer to the McKnights' complaint in the Underlying Action but did not elect to assume Islas's defense.

On June 3, 2014, LMFIC commenced this declaratory judgment action, pursuant to 28 U.S.C. § 2201, requesting a declaration from this Court that "it has no obligation to indemnify the McKnights for any judgment entered in the [Underlying Action] as no UIM coverage was purchased by the McKnights" and that "reformation . . . is not warranted in this matter." (Pl.'s Compl. ¶ 16, ECF No. 1.) Following discovery, LMFIC filed the instant Motion on February 6, 2015, contending that summary judgment is both warranted and appropriate because the McKnights rejected LMFIC's meaningful offer of UIM coverage. On February 23, 2015, the

McKnights filed their Cross Motion, asserting that LMFIC did not make a meaningful offer of UIM coverage and, consequently, that the Policy should be reformed by operation of law to include UIM coverage. Pursuant to the Consent Briefing Order, LMFIC filed its Reply and Memorandum in Opposition to the McKnights' Cross Motion on March 12, 2015, and the McKnights filed their Reply on March 19, 2015. Accordingly, the pending motions have been fully briefed and are now ripe for consideration.

## JURISDICTION

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is complete diversity of the Parties and the amount in controversy exceeds $75,000. LMFIC is a corporation organized under the laws of Wisconsin with its principal place of business in Massachusetts. The McKnights are citizens and residents of South Carolina. Finally, the amount in controversy is in excess of $75,000, exclusive of interest and costs. Therefore, this Court has diversity jurisdiction over this case.

## STANDARD OF REVIEW

To grant a motion for summary judgment, a court must find that "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). The judge is not to weigh the evidence but rather must determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). All evidence should be viewed in the light most favorable to the nonmoving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990). "[I]t is ultimately the nonmovant's burden to persuade [the court] that there is indeed a dispute of material fact. It must provide more than a scintilla of evidence—and not merely conclusory allegations or speculation—upon which a jury could properly find in its favor." *CoreTel Va., LLC v. Verizon Va., LLC*, 752 F.3d 364, 370 (4th Cir. 2014) (citations omitted) (citing *Thompson*

*v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002)).  "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate."  *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991).  Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

When opposing parties file motions for summary judgment, the trial court applies the same standard of review to both motions.  *See Northfield Ins. Co. v. Boxley*, 215 F. Supp. 2d 656, 657 (D. Md. 2002).  "The role of the court is to 'rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard.'"  *Id.* at 658 (quoting *Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co.*, 627 F. Supp. 170, 172 (D. Md. 1985)); *see also Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987) ("[T]he court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.").  The mere fact that both parties seek summary judgment "does not 'establish that there is no issue of fact and require that summary judgment be granted to one side or another.'"  *World-Wide Rights Ltd. P'ship v. Combe Inc.*, 955 F.2d 242, 244 (4th Cir. 1992) (quoting *Am. Fid. & Cas. Co. v. London & Edinburgh Ins. Co.*, 354 F.2d 214 (4th Cir. 1965)); *see also ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 45 n.3 (4th Cir. 1983) ("The court is not permitted to *resolve* genuine issues of material facts on a motion for summary judgment—even where . . . both parties have filed cross motions for summary judgment."); *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir. 1983) ("[C]ross-motions for summary judgment do not automatically empower the court to

dispense with the determination whether questions of material fact exist."). Nevertheless, dueling motions for summary judgment "may be probative of the nonexistence of a factual dispute," because "when both parties proceed on the same legal theory and rely on the same material facts the court is signaled that the case is ripe for summary judgment." *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983) (citing *Bricklayers, Masons & Plasterers Int'l Union v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975)); *see also Nafco Oil & Gas, Inc. v. Appleman*, 380 F.2d 323, 325 (10th Cir. 1967) ("[B]y the filing of a [summary judgment] motion a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the event his adversary's theory is adopted.").

## DISCUSSION

In its Motion, LMFIC contends that it is entitled to summary judgment because it made a meaningful offer of UIM coverage to the McKnights, which they rejected, in turn relieving LMFIC of the obligation to indemnify the McKnights in the Underlying Action. The McKnights, however, assert that summary judgment should be entered in their favor and the Policy reformed because LMFIC did not make the requisite meaningful offer of optional UIM coverage.[1] Thus, the critical question before the Court is whether LMFIC made a meaningful offer of UIM coverage to the McKnights. The relevant undisputed facts are set forth below as they correspond to the Court's analysis. For the reasons detailed extensively herein, the Court concludes that LMFIC did not make a meaningful offer of UIM coverage to the McKnights.

### I.  Governing Law

This Court has jurisdiction over the present action pursuant to 28 U.S.C. § 1332; therefore, the Court must apply South Carolina law and, where necessary, predict how the

---

1.   The McKnights also assert several additional arguments in support of their Cross Motion; however, because the Court finds that resolution of the meaningful offer inquiry is itself dispositive of the pending motions, the Court need not address or decide the remaining issues and arguments.

Supreme Court of South Carolina would decide a particular issue. *See Nationwide Mut. Ins. Co. v. Powell*, 292 F.3d 201, 203 (4th Cir. 2002); *Hartsock v. Am. Auto. Ins. Co.*, 788 F. Supp. 2d 447, 450–51 (D.S.C. 2011). The Parties agree that South Carolina law governs this dispute. South Carolina law requires automobile insurers to offer optional UIM coverage and optional additional UM coverage up to the limits of the insured's liability coverage.[2] S.C. Code Ann. § 38-77-160 (2015); *see also Carter v. Standard Fire Ins. Co.*, 753 S.E.2d 515, 519 (S.C. 2013) ("[A]n insurer must offer UIM coverage pursuant to [section] 38-77-160 when the insurer extends statutorily required liability coverage." (quoting *Howell v. U.S. Fid. & Guar. Ins. Co.*, 636 S.E.2d 626, 629 (S.C. 2006))), *reh'g denied* (Feb. 6, 2014). Specifically with regard to UIM coverage, section 38-77-160 provides that automobile insurance carriers "shall . . . offer, at the option of the insured, [UIM] coverage up to the limits of the insured liability coverage." *Id.* The Supreme Court of South Carolina has interpreted this mandate-to-offer language as requiring that "the insured . . . be provided with adequate information, and in such manner, as to allow the insured to make an intelligent decision of whether to accept or reject the coverage." *State Farm Mut. Auto. Ins. Co. v. Wannamaker*, 354 S.E.2d 555, 556 (S.C. 1987). Stated otherwise, "the insurer's offer of UIM coverage must be 'meaningful.'" *Cohen v. Progressive N. Ins. Co.*, 737 S.E.2d 869, 872 (S.C. Ct. App. 2013) (quoting *Atkins v. Horace Mann Ins. Co.*, 658 S.E.2d 106, 109 (S.C. Ct. App. 2008)).

"[T]he requirement of a meaningful offer of additional UM and UIM coverage is intended to protect an insured. A meaningful offer of additional UM and UIM makes as certain as possible that an insured has actual knowledge of his options with respect to such coverages

---

2.    The distinction between UM and UIM coverage in this context "relate[s]to the existence of a state-law mandate that motorists carry a minimum amount of [UM] coverage and the absence of any such requirement for [UIM] coverage." *Slice v. Liberty Mut. Fire Ins. Co.*, No. C.A. 3:09-00571-CMC, 2009 WL 4730639, at *4 n.8 (D.S.C. Dec. 7, 2009). Accordingly, insurers are required to offer both optional "additional" UM coverage beyond the mandatory minimum and optional UIM coverage.

and is therefore able to make an informed decision with respect to his desired coverage." *Grinnell Corp. v. Wood*, 698 S.E.2d 796, 800 (S.C. 2010) (citing *Floyd v. Nationwide Mut. Ins. Co.*, 626 S.E.2d 6, 12 (S.C. 2005)).  Consequently, "[a]ll law with respect to a meaningful offer of additional UM and UIM coverage must be applied so as to effectuate this stated purpose."  *Id.* at 799; *see also Carter*, 753 S.E.2d at 518 ("'[T]he UIM and UM statutes are remedial in nature and enacted for the benefit of injured persons' and 'should be construed liberally to effect the purpose intended by the Legislature.'" (quoting *Floyd*, 626 S.E.2d at 10)).  Accordingly, the insurer bears the burden of establishing that it made a meaningful offer of UIM coverage.  *Floyd*, 626 S.E.2d at 11 (citing *Progressive Cas. Ins. Co. v. Leachman*, 608 S.E.2d 569, 571 (S.C. 2005); *Butler v. Unisun Ins. Co.*, 475 S.E.2d 758, 759 (S.C. 1996)).  Whether an insurer has met its burden in this regard is a question of fact.  *Cohen*, 737 S.E.2d at 872; *see Floyd*, 626 S.E.2d at 12.  "If the insurer fails to comply with its statutory duty to make a meaningful offer to the insured, the policy will be reformed, by operation of law, to include UIM coverage up to the limits of liability insurance carried by the insured."  *Floyd*, 626 S.E.2d at 11 (quoting *Butler*, 475 S.E.2d at 760).

In *State Farm Mutual Automobile Insurance Co. v. Wannamaker*, 354 S.E.2d 555 (S.C. 1987), the Supreme Court of South Carolina enunciated a four-part test for determining whether an offer of UIM coverage or additional UM coverage is meaningful.  *Id.* at 556.  Under the *Wannamaker* test, an insurer must satisfy four criteria for an offer of optional insurance coverage to be considered "meaningful":

> (1) the insurer's notification process must be commercially reasonable, whether oral or in writing;
> (2) the insurer must specify the limits of optional coverage and not merely offer additional coverage in general terms;
> (3) the insurer must intelligibly advise the insured of the nature of the optional coverage; and

> (4) the insured must be told that optional coverages are available for an additional premium.

*Id.*; *see Dewart v. State Farm Mut. Auto. Ins. Co.*, 370 S.E.2d 915, 916 (S.C. Ct. App. 1988) (summarizing *Wannamaker*'s holding).  An insurer's "failure to satisfy this test nullifies any rejection of UIM coverage by the insured" and requires reformation of the policy to include such coverage up to the policy's limits of liability insurance.  *Powell*, 292 F.3d at 204.

In response to the *Wannamaker* decision, the South Carolina General Assembly enacted the Automobile Insurance Reform Act of 1989, 1989 S.C. Acts No. 148 ("Act").  *See Wiegand v. U.S. Auto. Ass'n*, 705 S.E.2d 432, 434 (S.C. 2011).  Section 22 of the Act, codified as amended at section 38-77-350(A) of the South Carolina Code of Laws, "establishes certain requirements for forms used by insurers in making offers of optional insurance coverages."  *Grinnell Corp.*, 698 S.E.2d at 799.  At a minimum, such a form must provide:

> (1) a brief and concise explanation of the coverage;
> (2) a list of available limits and the range of premiums for the limits;
> (3) a space to mark whether the insured chooses to accept or reject the coverage and a space to state the limits of coverage the insured desires;
> (4) a space for the insured to sign the form that acknowledges that the insured has been offered the optional coverages;
> (5) the mailing address and telephone number of the insurance department that the applicant may contact if the applicant has questions that the insurance agent is unable to answer.

S.C. Code Ann. § 38-77-350(A).  The statute mandates that the director of the Department of Insurance ("SCDOI") or his designee shall approve a form for use by insurers that satisfies these minimum requirements.  *See Wiegand*, 705 S.E.2d at 434–35.  Insurers must use a form promulgated or otherwise approved by the SCDOI in offering optional UIM and optional additional UM coverages.  *See* S.C. Code Ann. § 38-77-350(A); *see also Wiegand*, 705 S.E.2d at 435 ("This form must be used by insurers in offering optional coverages.").

If an insurer's form complies with these requirements and is properly completed and signed by the named insured, subsection (B) of section 38-77-350 provides a conclusive presumption that the insurer complied with section 38-77-160 by making a meaningful offer of the optional coverages.  *See Grinnell Corp.*, 698 S.E.2d at 799; *Cohen*, 737 S.E.2d at 873. Whether an offer form complies with section 38-77-350(A)'s requirements is a question of law for the court.  *Grinnell Corp.*, 698 S.E.2d at 799 n.3 (citing *Hanover Ins. Co. v. Horace Mann Ins. Co.*, 389 S.E.2d 657 (S.C. 1990)).  "The insurer has the burden of establishing that the requirements have been met in order to take advantage of the presumption."  *Wiegand*, 705 S.E.2d at 435.

Notwithstanding the foregoing, "[i]t is important to note '[f]ailure to comply with section 38-77-350(A) does not automatically require judicial reformation of a policy.  Rather, even where an insurer is not entitled to the presumption [in section 37-77-350(B)] that it made a meaningful offer, it may prove the sufficiency of its offer by showing that it complied with *Wannamaker*."  *Id.* (second and third alteration in original) (quoting *Grinnell Corp.*, 698 S.E.2d at 799–800); *see also McWhite v. ACE Am. Ins. Co.*, 412 F. App'x 584, 587–88 (4th Cir. 2011) ("The meaningful offer requirement can be satisfied in one of two ways: compliance with S.C. Code Ann. § 38-77-350(A) or satisfaction of the four-part test the South Carolina Supreme Court established in [*Wannamaker*]."); *Cohen*, 737 S.E.2d at 874 ("[T]he insurer's inability to get the conclusive presumption under subsection 38-77-350(B) does not mean the insurer did not make a meaningful offer in compliance with section 38-77-160.  Rather, it simply means the trial court must make the factual determination of whether the insurer made a meaningful offer." (footnote omitted)).  "Whether the analysis is focused primarily on the written form, the *Wannamaker* analysis, or both, the purpose of requiring automobile insurers to make a meaningful offer of

additional UM or UIM coverage 'is for insureds to know their options and to make an informed decision as to which amount of coverage will best suit their needs.'" *Croft v. Old Republic Ins. Co.*, 618 S.E.2d 909, 918–19 (S.C. 2005) (quoting *Leachman*, 608 S.E.2d at 573).

## II.    Analysis

### A.    LMFIC's Offer

In the present case, LMFIC's form purporting to make a meaningful offer of optional coverages consists of five pages and four separate sections or individual documents ("Offer Form").  The first and second pages of the Offer Form, titled "I.  Explanation of coverages," provide an overview of automobile insurance in South Carolina ("Explanation of Coverages Section").  (Offer Form 1–2, ECF No. 1-2.)  This Explanation of Coverages Section includes an explanation and summary of liability insurance, UM coverage, and UIM coverage.

The two-page Explanation of Coverages Section is followed by a one-page section captioned "Offer of uninsured motorist coverage" ("UM Section").  Although the UM Section's header indicates that it is "Page 3 of 5," the title is curiously preceded by Roman numeral "I." (*Id.* at 3.)  The UM Section contains a chart listing the various UM coverage limits available to the insured and the corresponding premium amounts per vehicle.  At the bottom of the chart, LMFIC   explains   that   "[m]inimum   uninsured   motorist   coverage   limits   of $25,000/$50,000/$25,000 are automatically provided by your insurance policy." (*Id.*)  The UM Section then instructs the recipient to sign and complete one of the two boxes provided that corresponds to the recipient's decision regarding additional UM coverage, while also noting that the insured's "selected limits cannot exceed your automobile insurance liability limits." (*Id.*)

The fourth page of LMFIC's Offer Form is titled "Offer of underinsured motorist coverage" ("UIM Section") and largely mirrors the UM Section.  In fact, as with the UM

Section, the title of the UIM Section is also preceded by Roman numeral "I," despite being labeled "Page 4 of 5." (*Id.* at 4.) Moreover, the UIM Section includes a chart—listing the available UIM coverage limits and the corresponding premiums—that is identical to the chart set forth in the UM Section. With the exception of this chart, the remainder of the UIM Section is replicated below:

> To obtain the underinsured motorist premium amounts for adding or removing vehicles, please contact us.

> Please complete the section below that matches your underinsured motorist coverage decision. Your selected limits cannot exceed your automobile insurance liability limits.

---

**Yes**, I wish to purchase additional underinsured motorist coverage.

I select _____/_____/_____ split limits; or
I select _____ Combined Single Limit

**Signature of Named Insured**                        **Today's Date**

X _____    _____

---

**No**, I do not want additional underinsured motorist coverage.

**Signature of Named Insured**                        **Today's Date**

_____    _____

---

(*Id.*)

The fifth page of the Offer Form is titled "Applicant's acknowledgement" ("Acknowledgment Section"). Although actually the fourth section and the final page of LMFIC's Offer Form, the Acknowledgement Section is enumerated as section "II." The Acknowledgement Section provides as follows:

> By my signature, I acknowledge that I have read – or I have had read to me – the above explanations and offers of additional uninsured motorist coverage

and optional underinsured motorist coverage. I understand that the above explanations of these coverages are intended only to be brief descriptions of additional uninsured motorist coverage and optional underinsured motorist coverage, and that payment of benefits under either of these coverages is subject both to the terms and conditions of my automobile insurance policy and the laws of the State of South Carolina.

My signature below further acknowledges that I understand the coverages as they have been explained to me, and the type and amounts of coverage marked on the preceding pages have been selected by me. This is the type and amount of insurance coverage I wish to purchase.

(*Id.* at 5.)

## B.    *The Section 38-77-350(B) Presumption*

The McKnights contend that LMFIC's Offer Form does not meet the requirements of section 38-77-350(A). Although LMFIC does not explicitly concede that its Offer Form does not satisfy section 38-77-350(A), LMFIC does acknowledge that its Offer Form was not approved by the director of the SCDOI. LMFIC's failure to obtain SCDOI approval of its Offer Form is not itself determinative of whether the Offer Form satisfied section 38-77-350(A)'s requirements. *See Wiegand*, 705 S.E.2d at 435 ("While approval alone is not dispositive of whether a form meets section 38-77-350(A)'s requirements, we believe it lends support to the view that [the insurer] satisfied the requirements." (citation omitted)); *see also Croft*, 618 S.E.2d at 918 ("[A] form does not necessarily constitute a meaningful offer simply because it was approved by the Department of Insurance." (quoting *Leachman*, 608 S.E.2d at 571–72)); *Wilkes v. Freeman*, 512 S.E.2d 530, 533 (S.C. Ct. App. 1999) ("[I]f an insurer's form offering UIM coverage fails to contain provisions similar to the Commissioner's form or fails to comply with sections 38-77-350 or 38-77-160, the insurer is not entitled to protection under section 38-77-350(B), even if the Commissioner approved the insurer's form." (citing *Osborne v. Allstate Ins. Co.*, 462 S.E.2d 291, 295 (S.C. Ct. App. 1995))). Nevertheless, because LMFIC does not argue or otherwise assert that its Offer Form complies with the statutory prerequisites—an issue on

12

which it, as the insurer, bears the burden of proof—the Court concludes that LMFIC is not entitled to the presumption afforded by section 38-77-350(B).  *See Wiegand*, 705 S.E.2d at 435. Accordingly, the Court will proceed to consider whether LMFIC made a meaningful offer as required by section 38-77-160 using the test set forth in *Wannamaker*.

### C.    The Wannamaker Test

In support of its Motion, LMFIC contends that it has no obligation to indemnify the McKnights in the Underlying Action because its Offer Form "meets the requirements of the . . . *Wannamaker* test." (Pl.'s  Mot. 6.)  The McKnights, however, assert that LMFIC failed to make a "meaningful offer" of UIM coverage under the *Wannamaker* test because its notification process was not commercially reasonable and because it failed to intelligibly advise them of the nature of optional UIM coverage.  The McKnights "take no issue" with regard to the second and fourth prongs of the *Wannamaker* test.  (Defs.' Cross Mot. 7.)  Because the Court finds that resolution of *Wannamaker*'s third prong is itself dispositive of the meaningful offer inquiry—and in turn, the pending motions—the Court need not separately address each prong of the *Wannamaker* test.[3]

---

3.    Generally, an insurer must satisfy each of *Wannamaker*'s four prongs in order to carry its burden of establishing that it made a meaningful offer.  *See, e.g., Bowman v. Cont'l Ins. Co.*, No. 99-2540, 2000 WL 1173992, at *2 (4th Cir. Aug. 14, 2000) (per curiam) ("Under South Carolina law, the failure to satisfy any one of these four prongs vitiates the offer of UIM coverage and requires reformation of the insurance policy to include UIM coverage to the limits of liability."); *Anders v. S.C. Farm Bureau Mut. Ins. Co.*, 415 S.E.2d 406, 408 (S.C. Ct. App. 1992) (explaining that the insured may prevail at the summary judgment stage "by showing, to the exclusion of other reasonable inferences, that the [insurer] failed as to at least one prong of the requirements of *Wannamaker*"). Although there have been instances in which courts have found that an insurer made a meaningful offer without meeting all of the *Wannamaker* factors, the facts of this case do not present such an occasion.  *See, e.g., Ray v. Austin*, 698 S.E.2d 208, 213 (S.C. 2010) (finding that the insurer met three of the four *Wannamaker* factors but refusing to apply the *Wannamaker* test in a manner that would "contravene[] the very purpose behind the meaningful offer requirement" and invite "the absurd result" of reforming a policy to provide coverage the insured "understood, did not want, and clearly rejected"); *Leachman*, 608 S.E.2d at 573 ("To compel coverage would overstep the purpose behind mandating a meaningful offer.").

Additionally, while the Court finds the McKnights' arguments as to *Wannamaker*'s first prong largely persuasive, the Court need not decide or declare that LMFIC's notification process was not commercially reasonable.  Nevertheless, many of the McKnights' arguments in this regard are relevant to, and may be considered in the context of, whether LMFIC provided "an intelligible explanation of [UIM] coverage in such a manner that the insured can make an informed decision to accept or reject the additional coverage."  *Dewart*, 370 S.E.2d at 917.

As noted above, the third prong of the *Wannamaker* test mandates that "the insurer must intelligibly advise the insured of the nature of the optional coverage." *Wannamaker*, 354 S.E.2d at 556. Stated otherwise, "*Wannamaker* requires the insurer to give an intelligible explanation of underinsured motorist coverage in such a manner that the insured can make an informed decision to accept or reject the additional coverage." *Dewart*, 370 S.E.2d at 917; *see also Wannamaker*, 354 S.E.2d at 556 ("We hold the statute mandates the insured to be provided with adequate information, and in such a manner, as to allow the insured to make an intelligent decision of whether to accept or reject the coverage."). At bottom, this requirement means that "the necessary information must be conveyed in a format and in language that make it readily understandable to a person of common intelligence." *Dewart*, 370 S.E.2d at 917. Therefore, "evidence of the insured's knowledge or level of sophistication is relevant and admissible when analyzing, under *Wannamaker*, whether an insurer intelligibly advised the insured of the nature of the optional UM or UIM coverage." *Grinnell Corp.*, 698 S.E.2d at 800 (quoting *Croft*, 618 S.E.2d at 918). However, before considering the insured's knowledge, sophistication, and understanding with respect to the nature of optional UIM coverage, the Court must first determine whether the insurer made an unambiguous offer of UIM coverage up to the policy's liability limits, either orally or in writing. *See Croft v. Old Republic Ins. Co.*, 233 F. App'x 262, 266 (4th Cir. 2007) (per curiam).

> ### i. *Offer Form*

In its Motion, LMFIC points only to the Explanation of Coverages Section of its Offer Form in support of its position that it intelligibly advised the McKnights of the nature of UIM coverage. More specifically, LMFIC contends that its Explanation of Coverages Section "included simple language outlining the definition of an underinsured vehicle, the nature of UIM

compensation, and the availability of UIM coverage where an at fault underinsured vehicle does not provide full compensation for damages sustained." (Pl.'s Mot. 6.) In their Cross Motion, the McKnights do not dispute the accuracy of LMFIC's Explanation of Coverages Section. Instead, they point to the UIM Section's description of the optional coverage as "additional" and insist that LMFIC's UIM Section is "contradictory to its Explanation of Coverages [Section], and more importantly, to South Carolina law." (Defs.' Cross Mot. 9.) According to the McKnights, the use of the word "additional" would naturally lead a reasonable person to believe that they already had UIM coverage. In response, LMFIC argues that, when viewed in its entirety, as opposed to reading the UIM Section in isolation, its Offer Form intelligibly advised the McKnights of the nature of UIM coverage.

After careful consideration, the Court finds that LMFIC's Offer Form did not, in and of itself, intelligibly advise the McKnights of the nature of UIM coverage. As noted above, the UIM Section of LMFIC's Offer Form asks the recipient to respond to either of the following: "Yes, I wish to purchase *additional* underinsured motorist coverage" or "No, I do not want *additional* underinsured motorist coverage." (Offer Form 4 (emphasis added).) Hence, the UIM Section of the Offer Form, viewed in isolation, describes the optional coverage as "additional." Yet, as stated previously, unlike UM coverage, UIM coverage in any amount is entirely optional. S.C. Code Ann. § 38-77-160; *see Slice*, 2009 WL 4730639, at *4 n.8 (explaining that the distinction between UM and UIM coverages in this regard "relate[s] to the existence of a state-law mandate that motorists carry a minimum amount of uninsured motorist coverage and the absence of any such requirement for underinsured coverage"). Insurers are therefore required to make a meaningful offer both of optional *additional* UM coverage, in excess of the minimum mandated by law, and of optional UIM coverage. Accordingly, any characterization—or more

appropriately, mischaracterization—of UIM coverage as "additional" is, as the McKnights contend, both confusing and contrary to law. Consequently, because it does not indicate that UIM coverage is optional in any amount up to the limits of the insured's liability coverage, without more, the UIM Section of LMFIC's Offer Form would inevitably lead "a person of common intelligence" to understand that LMFIC was offering or soliciting more coverage than that either quoted by the insurer and applied for by the insured or already provided by the recipient's existing policy with the same insurer. *Dewart*, 370 S.E.2d at 917; *cf. Slice*, 2009 WL 4730639, at *4 (recognizing the significance of the word "additional" in the meaningful offer context).[4]

Again, LMFIC does not argue that the inapposite and extraneous word is without consequence. Instead, LMFIC urges the Court to view the Offer Form in its entirety, insisting that courts must determine whether a contract is ambiguous by examining the contract as a whole and not merely an isolated clause.[5] In the present case, viewing the UIM Section in the context

---

4. Coincidentally, the insurer in *Slice* was LMFIC; however, the offer form at issue in *Slice* was not the same as the Offer Form presented to the McKnights. *See* Motion for Summary Judgment, Ex. 2, Offer Form, *Slice v. Liberty Mut. Fire Ins. Co.*, No. C.A. 3:09-00571-CMC, 2009 WL 4730639 (D.S.C. Dec. 7, 2009), ECF No. 28-2. In *Slice*, the insured challenged the adequacy of LMFIC's offer of optional coverage on the basis that she did not receive the "explanation of coverages" portion of the offer form at the same time that she received the two pages specifically offering UM and UIM coverages and requiring her decision and signature as to each. *See Slice*, 2009 WL 4730639, at *2–4. According to the insured, this caused her to misunderstand the effect of her choices and led her to believe that "she was declining additional coverage beyond that contained in her then-current policy, rather than declining *any* optional coverage." *Id.* at *3. Distinguishing UM and UIM coverages, the court in *Slice* rejected the insured's challenge and concluded that because the UIM section of the offer form at issue clearly explained that the insured's UIM coverage limits could not exceed one's liability limits and "d[id] not refer to 'additional' coverage," "this instruction preclude[d] any reasonable interpretation of the form to be a solicitation for more coverage." *Id.* at *4. Notably, the insured in *Slice* did not claim that there was any deficiency in the offer form itself and in fact conceded that the complete form provided proper notice of her options. *Id.* at *2. Here, unlike in *Slice*, the UIM Section of LMFIC's Offer Form explicitly refers to UIM coverage as "additional."

5. As an initial matter, the Court notes that it is reluctant to analyze LMFIC's Offer Form as a comprehensive document. Mrs. McKnight asserts—and LMFIC does not dispute—that the McKnights received the Offer Form in piecemeal fashion. Indeed, Mrs. McKnight signed and returned the Acknowledgement Section of the Offer Form on June 22, 2009, but the McKnights had not yet received the UM and UIM Sections at that time. In fact, Mr. and Mrs. McKnight did not sign the UIM and UM Sections, respectively, until July 6, 2009. LMFIC repeatedly seeks to downplay this point by noting that the McKnights ultimately received the entire Offer Form and by craving reference to the fact that the pages were numbered in a manner indicating that the document consisted of five pages. However, as previously noted, the UM and UIM Sections were each labeled section "I" rather than sections "II" and

of the Offer Form as a whole quickly reveals that LMFIC did not make an unambiguous offer of the optional coverage. *See generally State Farm Mut. Auto. Ins. Co. v. Medgyesy*, No. 14-1570, 2015 WL 2041076, at *1 (4th Cir. May 5, 2015) (per curiam) (discussing South Carolina law regarding contract ambiguity as it relates to an insurer's offer forms).

First, LMFIC seeks to rely on the language contained in its Explanation of Coverages Section, maintaining that after reviewing this portion of the Offer Form, "any reasonable person would clearly understand that LMFIC intelligibly advised the McKnights of the nature of UIM coverage." (Pl.'s Reply 6.) LMFIC specifically points to and emphasizes the following language set forth on the first page of its Explanation of Coverages Section:

> An insurer that writes your automobile liability insurance coverage must also offer two additional coverages. . . . These coverages are termed *additional uninsured* motorist coverage and *optional underinsured* motorist coverage, respectively. . . . If you decide to purchase either of these coverages, you will be required to pay an additional premium for each of these coverages.

(*Id.*) LMFIC also notes that its Explanation of Coverages Section advises insureds that "[y]our automobile insurance policy *does not automatically provide any underinsured motorist coverage*." (*Id.* at 6.) While both explanations of UIM coverage are accurate, neither goes so far as to affirmatively correct the misstatement or mischaracterization of the optional coverage prominently displayed[6] in the UIM Section of LMFIC's Offer Form. Unlike the offer form used in *Wiegand*, the Explanation of Coverages Section of LMFIC's Offer Form does not explicitly

---

"III," respectively. Moreover, the Acknowledgement Section was labeled section "II," despite being the fifth page of LMFIC's Offer Form. *But cf. Slice*, 2009 WL 4730639, at *3 n.6 (stating that the various pages of an offer form should not be considered separate documents while noting that the pages were consecutively numbered and that the sections were appropriately designated with the corresponding Roman numerals). Nevertheless, for purposes of a more complete analysis, the Court will consider the UIM Section in the context of the Offer Form as a whole.

6. While the significance and potential, if not actual, impact of this "additional" word cannot be overstated, its prominent placement is itself noteworthy. By featuring the confusing language above the critical part of the document, a recipient of the UIM Section may not refer to the more extensive explanation of UIM coverage, after concluding, based on the brief description, that *additional* UIM coverage is unnecessary. Further still, where, as here, the insured believes that the policy already provides or includes UIM coverage equal to the limits of liability coverage, the recipient may reasonably conclude that additional UIM coverage is not available, since the UIM Section clearly states that "[y]our selected limits cannot exceed your automobile insurance liability limits." (Offer Form 4.)

state that "[y]our automobile insurance policy does not provide *any* underinsured motorist coverage." *Wiegand*, 705 S.E.2d at 433 (emphasis added). Instead, it simply notes that the corresponding policy does not *automatically* provide any UIM coverage. Thus, although technically correct, LMFIC's Explanation of Coverages Section does not foreclose—and indeed invites if not reinforces—an interpretation or understanding that UIM coverage in some amount is already included. Therefore, when viewed as a whole, LMFIC's Offer Form is, at best, "capable of more than one meaning." *N. Am. Rescue Prods., Inc. v. Richardson*, 769 S.E.2d 237, 240 (S.C. 2015) (citing *Lee v. Univ. of S.C.*, 757 S.E.2d 394, 397 (S.C. 2014)), *reh'g denied* (Mar. 19, 2015); *see also Bardsley v. Gov't Emps. Ins. Co.*, 747 S.E.2d 436, 40 (S.C. 2013) ("An ambiguous contract is one capable of being understood in more senses than one, an agreement obscure in meaning, through indefiniteness of expression, or having a double meaning." (quoting *Bruce v. Blalock*, 127 S.E.2d 439, 441 (S.C. 1962))).

Second, LMFIC attempts to compare the UIM and UM Sections of its Offer Form and, in doing so, seeks to emphasize that the UIM Section does not include certain qualifying or clarifying language used in the UM Section. Specifically, LMFIC points to the following language in the UM Section: "Minimum uninsured motorist coverage limits of $25,000/$50,000/$25,000 are automatically provided by your insurance policy." (Offer Form 3.) Asserting that "[s]imilar language is noticeably absent" from its UIM Section, LMFIC contends that the McKnights "should have no reasonable expectation that the policy, as initially purchased, contained *any* [UIM] coverage." (Pl.'s Reply 7.) In essence, without addressing the significance or impact of the extraneous "additional" in the UIM Section of its Offer Form, LMFIC asks this Court to impose a duty on an insured to read between the lines. After careful consideration, the Court concludes that LMFIC's argument that an insured should disregard the

significance of a key word actually included in the UIM Section of its Offer Form yet simultaneously recognize the importance of words omitted strains credulity. *See generally Island Creek Coal Co. v. Lake Shore, Inc.*, 832 F.2d 274, 277 (4th Cir. 1987) ("The argument of the plaintiffs is contrary to that universal rule of contract law that, in construing language in a contract, 'an interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless' . . . . 'A contract will not be construed so as to reject any words as surplusage if they can reasaonably [sic] be given meaning.'" (quoting *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed. Cir. 1983); *Union Inv. Co. v. Fid. & Deposit Co. of Ind.*, 549 F.2d 1107, 1110 (6th Cir. 1977))). Moreover, the Court is particularly unmoved by LMFIC's argument in this regard, where, as here, the record reflects that the UM and UIM Sections were not signed by the same named insured under the Policy.[7] *Cf. McDonald v. S.C. Farm Bureau Ins. Co.*, 518 S.E.2d 624, 626 (S.C. Ct. App. 1999) ("Clearly, the legislature intended for insurers to afford all named insured the opportunity to accept or reject UIM coverage.").

In short, LMFIC's Offer Form did not, in and of itself,[8] unambiguously and intelligibly advise the McKnights of the nature of UIM coverage. Instead, the Offer Form's language is at best confusing, if not outright conflicting, because it "misleadingly suggest[s]," *Croft*, 233 F. App'x at 266, that the insurer is offering or soliciting more coverage than that quoted by the insurer, applied for by the insured, or already provided by the insured's existing policy with the

---

7.  Mrs. McKnight signed the UM Section of LMFIC's Offer Form on July 6, 2009, and Mr. McKnight signed the UIM Section the same day.
8.  Although "[b]oth the written forms and the parties' oral communications about the coverage may be considered to determine whether a meaningful offer was made," *Croft*, 233 F. App'x at 266, LMFIC does not reference or otherwise attempt to rely on any such oral representations or statements despite bearing the burden of demonstrating that it made a meaningful offer of UIM coverage to the McKnights. Nevertheless, as detailed below, the record is devoid of evidence that any confusion the McKnights had, or may have had, after reviewing the UIM Section of the Offer Form, was cured or corrected after speaking with an LMFIC representative by telephone on June 29, 2009. *See id.* ("There is no evidence that discussions between [insured] and [insurer] did anything to mitigate the effects of this misstatement.").

same insurer, *see Slice*, 2009 WL 4730639, at *4 & n.8.  Accordingly, LMFIC's Offer Form does not convey the requisite information and explanation of the optional coverage in a language and format "readily understandable to a person of common intelligence."  *Dewart*, 370 S.E.2d at 917.  To conclude otherwise in this case would run counter to "[t]he clear purpose of the meaningful offer requirement[, which] is to protect insureds—to give them the opportunity 'to know their options and to make an informed decision as to which amount of coverage will best suit their needs.'"  *Ray*, 698 S.E.2d at 213 (quoting *Floyd*, 626 S.E.2d at 12)).

*ii.  Totality of the Transaction*

While the foregoing examination of LMFIC's Offer Form is itself sufficient to conclude that LMFIC did not intelligibly advise the McKnights of the nature of UIM coverage as required by *Wannamaker*, the Court notes that this determination is only further confirmed by considering the totality of the transaction and its impact on the McKnights' subjective understanding of the optional coverage.  *Cf. Slice*, 2009 WL 4730639, at *5 ("To the extent *Wannamaker* and subsequent cases may allow consideration of subjective understanding and intent, this argument is, nonetheless, unavailing given that the misunderstanding was not, in any way, attributable to [the insurer].");  *Cohen*, 737 S.E.2d at 872 (affirming the trial court's meaningful offer determination based on its analysis of the "totality of the transaction").  As noted above, evidence of an insured's knowledge or level of sophistication may be considered in determining whether an insurer intelligibly advised the insured of the nature of optional UIM coverage.  *Grinnell Corp.*, 698 S.E.2d at 800 (quoting *Croft*, 618 S.E.2d at 918).  This determination "is a subjective inquiry to the extent the insured may offer evidence of his understanding, or lack thereof, of the nature of UM or UIM coverage.  It also is an objective inquiry because the factfinder should consider the insured[']s knowledge and level of sophistication in determining

whether the insurer intelligibly explained such coverage to the insured." *Croft*, 618 S.E.2d at 918; *see also Ray*, 698 S.E.2d at 213 ("One who is ignorant and unwary might require more explanation than a sophisticated applicant." (quoting *Anders*, 415 S.E.2d at 409)). Here, the Court finds that the undisputed facts paint the picture of a scenario in which it is quite clear that LMFIC did not make a meaningful offer of UIM coverage to the McKnights.

The record reflects that on or about May 1, 2009, Mrs. McKnight contacted LMFIC to inquire about insuring the McKnights' three vehicles. In response to Mrs. McKnight's inquiry, Karla Lynch ("Lynch"), an agent or employee of LMFIC, emailed Mrs. McKnight to thank her for her time and to provide a proposal and rate quotation ("First Quote"). The First Quote included liability limits of $100,000/$300,000/$50,000 and matching UM and UIM coverages for each of the McKnights' three vehicles. On May 5, 2009, Mrs. McKnight responded to Lynch's email stating that she "noticed that the quote went up about $400.00" from what they had previously discussed and asking if it would be possible to "lower the coverage" to reduce her monthly payments. (Defs.' Cross Mot., Ex. A, ECF No. 18-2, at 4.) Approximately one hour later, Lynch replied with a revised proposal and rate quotation ("Second Quote"). As requested, the Second Quote was adjusted to reduce the annual premium by $407.00. However, like the First Quote, the Second Quote also included liability, UM, and UIM coverages with matching limits of $100,000/$300,000/$50,000 for each of the McKnights' three vehicles.

LMFIC subsequently debited Mrs. McKnight's bank account on June 13, 2009, "for the premium amount of $292.18, which was higher than what was previously quoted to [her] by Karla Lynch and which [resulted in] a negative bank balance." (C. McKnight Aff. ¶ 7, ECF No. 18-1.) As a result, Mrs. McKnight was charged a $30.00 insufficient-funds fee, which LMFIC later refunded or credited after Mrs. McKnight contacted LMFIC. According to her Affidavit,

Mrs. McKnight understood that the McKnights' three vehicles were covered by LMFIC once the premium was paid on June 13, 2009.

On June 22, 2009, Mrs. McKnight faxed a number of documents to LMFIC that the McKnights had received by mail. One such document was the Acknowledgement Section of LMFIC's Offer Form, which was signed by Mrs. McKnight and dated June 22, 2009.[9] Again, although the page numbering indicates that the Offer Form is five pages, the McKnights contend—and LMFIC does not dispute—that they received the various sections of the Offer Form on different days. As of June 22, 2009, the McKnights had not received either the UM or UIM Sections of LMFIC's Offer Form; however, it appears from the record that they may have been in possession of the Explanation of Coverages Section at that time.

The McKnights thereafter received the UM and UIM Sections of the Offer Form, and on June 29, 2009, Mrs. McKnight called LMFIC to ask about these documents. As stated in her Affidavit, Mrs. McKnight recalls that "[she] told the [LMFIC] employee that [she] did not want additional uninsured and underinsured motorist coverage believing that [she] already had the coverage." (*Id.* ¶ 15.) Mrs. McKnight further asserts that the LMFIC representative instructed her "to sign that [she] declined additional uninsured and underinsured motorist coverage on the forms" and that "[a]t no time did the [LMFIC] employee tell [her] that [she] did not have underinsured motorist coverage." (*Id.* ¶¶ 16–17.) Moreover, Mrs. McKnight contends that "[i]t

---

9. Three of the documents were related to either Mr. McKnight's son's driver training or his eligibility for a good-student discount. The final document was a fraud statement and applicant authorization form that was signed by both Mr. and Mrs. McKnight and dated June 22, 2009 ("June 22, 2009 Applicant Authorization"). Although it does not explicitly indicate as much, it appears that the June 22, 2009 Applicant Authorization represents the second page of LMFIC's standard policy application; however, the only such application in the record is dated June 25, 2009 ("June 25, 2009 Application"). While the June 25, 2009 Application reflects that UIM coverage was declined, LMFIC has not produced a corresponding fraud statement and applicant authorization form signed by one or both of the McKnights and dated June 25, 2009, or later. Curiously, the Court notes that the premium reflected on the June 25, 2009 Application is $200 more than the estimated premium listed on the Second Quote, which included UIM coverage in the amount of $100,000/$300,000/$50,000. Further still, Mrs. McKnight states in her Affidavit that she does not recall ever seeing the June 25, 2009 Application.

was always [her] intention to have underinsured motorist coverage on these three vehicles." (*Id.* ¶ 21.)  On July 6, 2009, the McKnights returned the UM and UIM Sections of the Offer Form, which were signed by Mrs. McKnight and Mr. McKnight, respectively.

After carefully considering the record, the Court finds that the undisputed evidence reveals a scenario in which it was understandable and foreseeable that one or both of the McKnights would believe that the Policy provided UIM coverage.  Indeed, if a customer receives a quote that includes UIM coverage in an amount equal to the limits of liability coverage and is subsequently charged an amount greater than that quoted, the customer cannot be said to have reasonably expected less coverage than it initially sought from the insurer.  Here, Mrs. McKnight plainly states that she understood that the Policy included UIM coverage in the amount of $100,000/$300,000/$50,000, as reflected in the Second Quote.  The Explanation of Coverages Section of LMFIC's Offer Form did not advise otherwise—it simply noted that the Policy did not *automatically* include UIM coverage.  Although correct, this statement alone did not contradict Mrs. McKnight's belief that the Policy had matching liability and UIM limits.  Further complicating matters, when the McKnights ultimately received the UIM Section of the Offer Form, they were confronted with the misleading question of whether they wanted "additional" UIM coverage yet simultaneously admonished that optional UIM coverage limits could not exceed one's liability limits.  Accordingly, when viewed against this backdrop, the McKnights' apparent conclusion that *additional* UIM coverage was not available to them was both reasonable, if not rational, under the circumstances and entirely foreseeable.[10]  *Cf. Cohen*, 737 S.E.2d at 872–73.

---

10.  Although LMFIC insists that the McKnights' subjective understanding of UIM coverage is irrelevant and that consideration of the same is not proper, the Court need not address LMFIC's arguments in this regard both because the arguments themselves lack merit and because the Court would arrive at the same conclusion independent of such evidence and the reasonable inferences drawn therefrom.

* * *

In sum, the Court concludes, for the reasons outlined above, that LMFIC "fail[ed] to comply with its statutory duty to make a meaningful offer" of optional UIM coverage to the McKnights. *Floyd*, 626 S.E.2d at 11 (quoting *Butler*, 475 S.E.2d at 760).  Accordingly, because LMFIC, as the insurer, did not carry its burden of establishing that it made a meaningful offer of UIM coverage, *see id.*, the Court denies LMFIC's Motion and grants the McKnights' Cross Motion, *see Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 258 (4th Cir. 1998) ("Summary judgment is appropriate when a party who will bear the burden at trial fails to make a showing sufficient to establish an essential element of the case . . . .").  Moreover, because the McKnights were deprived of this statutorily required meaningful offer of optional UIM coverage, the Policy "is deemed reformed by operation of law to include underinsured motorist coverage at the limits of [the McKnights'] liability coverage."[11]  *Hanover Ins. Co.*, 389 S.E.2d at 658–59 (citing *Wannamaker*, 354 S.E.2d 555; *Davis v. State Budget & Control Bd.*, 378 S.E.2d 604 (S.C. Ct. App. 1989)); *see Croft*, 233 F. App'x at 265 (citing *Butler*, 475 S.E.2d at 760); *McWhite*, 412 F. App'x at 587–88 (quoting *Ray*, 698 S.E.2d at 212).

---

11. The McKnights' Cross Motion asserts that the Policy should be reformed to provide UIM coverage in the amount of $100,000/$300,000/$100,000.  However, the Court presumes that the McKnights intended to seek reformation of the Policy to provide UIM coverage of $100,000/$300,000/$50,000, as they reference the First and Second Quotes in doing so, both of which quote UIM coverage of $100,000/$300,000/$50,000.  Nevertheless, because the McKnights' liability coverage limits under the Policy were $100,000/$300,000/$50,000, the Policy will be reformed to provide UIM coverage with limits of $100,000/$300,000/$50,000.

## CONCLUSION

For the foregoing reasons, it is **ORDERED** that LMFIC's Motion is **DENIED** and the McKnights' Cross Motion is **GRANTED**.

**AND IT IS SO ORDERED.**

PATRICK MICHAEL DUFFY
United States District Judge

**August 14, 2015**
**Charleston, South Carolina**